IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII


K.K., Individually and on behalf of her ) CIV. NO. 14-00358 JMS-RLP
minor child, K.S.K.,                    )
                                        ) ORDER AFFIRMING JULY 2014
        Plaintiffs-Appellants,          ) DECISION OF ADMINISTRATIVE
                                        ) HEARINGS OFFICER
        vs.                             )
                                        )
STATE OF HAWAII,                        )
DEPARTMENT OF EDUCATION,                )
and KATHRYN MATAYOSHI, in her           )
official capacity as Superintendent of  )
the Hawaii Public Schools,              )
                                        )
        Defendants-Appellees.           )
_____ )

## ORDER AFFIRMING JULY 2014 DECISION OF ADMINISTRATIVE HEARINGS OFFICER

## I. INTRODUCTION

Like many cases brought under the Individuals with Disabilities

Education Act, 20 U.S.C. § 1400 *et seq.* ("IDEA"), this action challenges an

Individualized Education Program ("IEP") -- it requires the court to determine

whether Defendants State of Hawaii, Department of Education, and Kathryn

Matayoshi, in her official capacity as its Superintendent of Education (collectively,

"Defendants" or "DOE") offered a Free Appropriate Public Education ("FAPE")

to Plaintiffs K.K. ("Mother"), individually and on behalf of her minor child,

K.S.K. ("Student") (collectively, "Plaintiffs"). An Administrative Hearings Officer determined that Plaintiffs failed to demonstrate a denial of FAPE, and Plaintiffs appeal.

This action, however, is quite unique -- near the beginning of the school year in question, Student apparently suffered a serious injury to her skull in a fight at school. The injury could have affected many, if not all, aspects of her educational requirements. To be most effective, a revised IEP needed to consider basic information about Student's current condition, as well as updated academic evaluations and assessments. For whatever reason, Student's Mother (and her counsel, Mr. Keith Peck) interfered with Defendants' efforts to obtain such current information. And during an IEP meeting, Plaintiffs' counsel acted unprofessionally at times by constantly interrupting the discussion, making repeated nonsensical and sarcastic remarks, and demeaning the IEP team.[1] Nevertheless, *despite* a lack of cooperation, Defendants prepared an IEP that offered a FAPE reasonably calculated to provide Student meaningful educational benefit, and that called for new assessments and revision after receiving updated information. That is, Defendants met a "duty to move forward with the IEP

---

[1] Two lengthy IEP meetings were recorded, and the Hearings Officer made detailed findings of many of the exchanges between counsel and the IEP team at one of the meetings. The court has listened to the recordings, confirming the Hearings Officer's findings.

process," *Doug C. v. Hawaii Dept. of Educ.*, 720 F.3d 1038, 1045 n.6 (9th Cir. 2013), and to comply with the IDEA's mandates. Accordingly, the Administrative Hearings Officer's Decision is AFFIRMED.

## II. BACKGROUND

Plaintiffs challenge Administrative Hearings Officer Rowena A. Somerville's July 11, 2014 Findings of Fact and Conclusions of Law (the "July 2014 Decision") under 20 U.S.C. § 1415(i)(2). The 41-page July 2014 Decision was particularly comprehensive and thorough -- the court has independently reviewed the evidence and confirmed the Hearings Officer's careful references to the administrative record, and gives considerable deference to her factual determinations. *See, e.g.*, *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) ("When exercising [the court's] discretion to determine what weight to give the hearing officer's findings [in an IDEA case], one criterion . . . is to examine the thoroughness of those findings. The amount of deference accorded the hearing officer's findings increases where they are 'thorough and careful.'") (citation omitted).

In relevant part, the July 2014 Decision upheld a December 12, 2013 IEP, concluding that Plaintiffs had failed to prove that the IEP was a denial of

FAPE.[2]  AR at 000380, July 2014 Decision at 41.[3]  The court does not reiterate all of the July 2014 Decision's findings, but instead focuses on many of the findings relevant to the IEP team's attempts to prepare that IEP and Plaintiffs' challenge to it.

It is undisputed that Student qualifies as a "child with a disability" for purposes of 20 U.S.C. § 1401(3)(A).  She was born in 1999, and had been receiving special education services since at least 2011, most recently at Iao Intermediate School in Wailuku, Maui (the "Home School") under a category of "other health impairments."  July 2014 Decision at 4; Pls.' Ex. 1 at 046 (Dec. 5, 2011 IEP).  Her IEPs refer to a medical health concern of a "failing immune system and rare [gastrointestinal] disease" that impacts her school attendance.  Defs.' Ex. 3 at 000019.  In this regard, the record contains three prior IEPs from

---

[2]  The July 2014 Decision also upheld an April 26, 2013 IEP, but Plaintiffs are no longer challenging the Hearings Officer's rulings regarding that IEP.  *See* Doc. No. 18, Pls.' Opening Br. at 2 (withdrawing Complaint's allegations that the "educational and related services program offered prior to an 8/23/2013 assault was a violation of free appropriate public education," Doc. No. 1 at 4-5).  This proceeding challenges only the December 12, 2013 IEP, and its preparation.

[3]  The record consists of several sets of documents.  This Order uses the following abbreviations:  (1) "AR" refers to the Administrative Record on Appeal (numbered from 000001 to 000394, with Exhibits 1 to 38); (2) "July 2014 Decision" refers to the July 11, 2014 Findings of Fact and Conclusions of Law, at AR 000339-000380; (3) "Pls.' Ex." refers to Plaintiffs' Exhibits (numbered from 001 to 092, with Exhibits 1 to 4; (4) "Defs.' Ex." refers to Defendants' Exhibits (numbered from 000001 to 000140, with Exhibits 1 to 10; (5) "Tr." refers to three volumes of transcripts of administrative hearings (held on April 21, 2014, April 29, 2014, and April 30, 2014); and (6) "Doc. No." refers to the document number in the District Court's electronic case file in this action.

December 5, 2011, December 4, 2012, and April 26, 2013. *See* Pl.'s Ex. 1 at 046; Defs.' Ex. 3 at 000017, 000027. The current challenge, however, concerns the December 12, 2013 IEP, which was prepared after IEP team meetings on November 15, 2013 and December 12, 2013. Defs.' Ex. 3 at 000036-000047. Although only the December 12, 2013 IEP is at issue, several aspects of the Student's history at the Home School are important to understand the context of the challenge.

**A.      The April 26, 2013 IEP**

The April 26, 2013 IEP, prepared near the end of Student's seventh grade year, indicated that Student was progressing relatively well. It described plans to further integrate Student into the regular education curriculum for the upcoming school year. For example, the "clarification of services and supports" section of the April 26, 2013 IEP provides:

> [Student] has made good gains this year, therefore, it has
> been decided that she will be placed into the Inclusion
> setting for all four core classes, starting her 8th grade
> year. She will no longer take Reading Workshop. It is
> recommended that she take a Reading RTI to give her
> any supports she might need.

Defs.' Ex. 3 at 000034. That IEP (which covered the period until December 4, 2013), among other services, offered Student 750 minutes per week of special

education instruction and certain supplementary aides and services.  *Id.*  It explained that "[d]ue to the nature of [Student's] disability, she will be in Special Education Study Skills and Language Arts classes.  She will participate in all other classes with nondisabled students."  *Id.*  And it determined that Student "does not meet the standard for an extended school year [("ESY")]."  *Id.*  (Likewise, the prior IEPs for December 5, 2011 and December 4, 2012 also did not provide for ESY -- a decision that Student's Mother agreed with at the time.  July 2014 Decision at 5.)

The April 26, 2013 IEP referred to two dates for the Fall of 2013 that were particularly important:  Student had a December 4, 2013 "IEP Annual Review Date," and a December 6, 2013 "Reevaluation Date" (referring to a requirement for a formal reevaluation every three years under 20 U.S.C. § 1414(a)(2)(B)[4] and 34 C.F.R. § 300.303(b)(2)[5]).  Defs.' Ex. 3 at 000027.

---

[4]  Section 1414(a)(2), regarding "reevaluations" provides in part:

> (A) In general
> A local educational agency shall ensure that a reevaluation of each child with a disability is conducted in accordance with subsections (b) and (c) --
>> (i) if the local educational agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or
>> (ii) if the child's parents or teacher requests a reevaluation.
> (B) Limitation
> A reevaluation conducted under subparagraph (A) shall occur --
>> . . . .

(continued...)

**B.      The August 23, 2013 Incident**

In July 2013, prior to the start of Student's eighth grade year,

Student's mother met with the Principal of the Home School regarding "a text that

Student received about other Students planning a fight."  July 2014 Decision at 7.

Mother testified at the administrative hearing that "she went back to the Principal

two days later to show her an additional text of the planned fight," and "showed

the Principal more texts about the fighting after the school year started."  *Id.*  She

told the Principal on August 23, 2013 that "she was worried about Student and the

fighting."  *Id.* at 8.

Apparently as forecasted, Mother testified that on August 23, 2013,

Student was "kicked, hit, beaten, thrown into a wall, and thrown into a sink," and

"that the hospital said Student's skull was 'broken.'"  *Id.*; Tr. (Apr. 29, 2014) at

35.  The exact nature of this August 23, 2013 incident, and the full extent of

Student's injuries, is not clear from the record.  Evidently, however, it was

---

[4](...continued)
　　　　　　(ii) at least once every 3 years, unless the parent and the
　　　　　local educational agency agree that a reevaluation is unnecessary.

[5]  Section 300.303, regarding reevaluations, provides in part:

　　　　A reevaluation conducted under paragraph (a) of this section --
　　　　. . . .
　　　　(2) Must occur at least once every 3 years, unless the parent and the
　　　　public agency agree that a reevaluation is unnecessary.

traumatic and caused a serious injury to Student.  Mother testified that Student was

"terrified of returning to a DOE school" after the incident, July 2014 Decision at 8,

describing symptoms that might indicate cognitive changes because of a "broken"

brain.  *Id.* at 17-18, 21.  This is the last time Student was in school -- her then-

current teachers had only seen her six to eight times during her eighth grade

school year.  *Id.* at 10.

**C.    Plaintiffs' Rejection of Services and Initial Request for Due Process Hearing**

On August 28, 2013, the Principal of the Home School met with

Mother "to discuss educational options for Student ranging from classwork and

homework being provided or home hospital instruction."  *Id*. at 8 (citing Defs.'

Ex. 8 at 000111).  Mother stated that "Student was not able to do any schoolwork

at that time."  *Id.*  On September 4, 2013, the Principal wrote to Mother, following

up after the August 28, 2013 meeting, again offering home hospital instruction:

> We would like to reiterate our offer to work with you to
> ensure that [Student] is able to make up school work due
> to her absence.  It has been a week since our last meeting
> and at this time if [Student] is still not able to return to
> school but able to do school work at home, we would
> like to offer home hospital instruction.  Please inform us
> if [Student] is able to participate in home hospital
> instruction so we can arrange for a home hospital
> instruction teacher for [Student].

Defs.' Ex. 8 at 000111.

Mother did not accept the offer of home hospital instruction. Instead, on September 10, 2013, Plaintiffs filed an administrative Request for Due Process Hearing under Title 8, Chapter 60 of the Hawaii Administrative Rules ("HAR"). July 2014 Decision at 2. This initial Request is not in the record, but apparently asserted that the August 23, 2013 incident was a denial of FAPE because the April 26, 2013 IEP lacked a safety plan, and failed to offer ESY. *See* AR at 000003 (*Amended* administrative complaint of Dec. 20, 2013, asserting, among other matters, that (1) the DOE was aware of Student's safety needs and failed to address them in the April 26, 2013 IEP, and (2) the April 26, 2013 IEP improperly failed to provide for ESY services). Although these challenges to the April 26, 2013 IEP are no longer at issue, this pending September 10, 2013 challenge resulted in the involvement of counsel (both for Plaintiffs and Defendants) in subsequent IEP-related proceedings.

The Home School subsequently received a note from Student's doctor, dated September 16, 2013, stating that "[Student] is a pt under my care who suffered a skull injury [on] 8/23/13. She is excused from school until further notice. This patient is unable to do any capacity of school work until injury improves." Defs.' Ex. 3 at 000037; July 2014 Decision at 9.

"The Home School tried repeatedly to gain Mother's consent for exchange of medical information, but she and Mr. Peck declined to provide consent." July 2014 Decision at 9. The Home School also continued to offer Student educational services. For example, on September 30, 2013, the Principal of the Home School wrote to Mother as follows:

> This is to reiterate [Home] School's offer of home hospital instruction for [Student's] educational services that was presented to you on the morning of September 25, 2013 when you came in to submit [Student's] Renaissance application forms. When I offered you the services . . . you stated that [Student] is not in any condition to receive any educational services. Please advise us as soon as possible when her doctor determines that [Student] can start to receive educational services.

> Also, we would like to schedule an IEP meeting with you in order to determine how [Home] School can provide educational services to [Student]. Please advise us of the earliest date you could attend such a meeting.

> In addition, we are requesting that [Student's] doctor provide us updates on her medical condition to determine when she is able to start receiving educational services. Attached is a Consent to Release Information form for you to sign to allow us to access [Student's] medical reports.

Defs.' Ex. 8 at 000114.

By letter from Mr. Peck of October 5, 2013, Plaintiffs responded to the DOE's September 30, 2013 letter by (1) stating they had rejected all DOE

services; (2) objecting to the request for consent to obtain Student's medical

information because the DOE had provided a blank form, and stating "[w]e are not

obligated to provide consents for the DOE for such unfettered access [to Student's

medical records];" (3) indicating that "[Student] will be attending an Alternative

Placement, as capable," and would be willing to periodically "verify[] a medical

recommendation that [Student] avoid any educational instruction and/or

participation with DOE personnel, until such time that [Student] does begin her

private program;" (4) rejecting "any offer that fails to recognize [Plaintiffs'] rights

to provide a private alternative program;" (5) agreeing to attend an IEP meeting by

telephone; and (6) explaining that "[h]ome-bound services will not be

acceptable . . . since the family [has] already rejected DOE services in substitute of

a more appropriate remedy for past malfeasance."  Defs.' Ex. 8 at 000116.

Student started attending "Education[] Therapy, Inc." ("ETI")

"approximately five to six weeks after the August 23, 2013 incident."  July 2014

Decision at 9.  "Student would attend ETI for 20 minutes per day, for socialization

at lunch-time."  *Id.*  Later, at a December 12, 2013 IEP meeting, Mother stated that

Student attends ETI "at least one day a week, one or two hours a week."  *Id*. at 16.

"The IEP team did not know that Student was doing this."  *Id*.  A teacher and the

Principal told Mother "they couldn't authorize ETI as a placement because it was a

private organization, and they did not have the ability to place her there," explaining that Student "would be unable to earn transferrable credits from schooling at ETI." *Id.* at 17.

At the administrative hearing, a special education teacher testified that she had worked at ETI for several months in 2006, describing ETI (at least as of several years before the IEP at issue) as "not an accredited school, it is not a standards-based school." Tr. (Apr. 30, 2014) at 438. "It's not a school at all, it's actually a tutoring service. It is an awesome place for a secondary support system, but is not a primary education facility." *Id.* She reiterated that "it's a great tutoring [service] . . . but as a primary education . . . I don't believe that it has the same rigor that a DOE school does." *Id*. at 440. She also testified that she was aware of the current curriculum -- describing it as "tutoring" that is "supposed to be in support of regular school." *Id.*

On October 15, 2013 (with Student's annual and three-year evaluation dates approaching), a DOE representative emailed Mother with options about providing consent for reevaluations and testing:

> [I]t has been approximately three years since [Student] had her last academic and cognitive tests. We would like to perform these tests as soon as you think [Student] is able. Please advise me when you think this might be. [Student's] three year re-evaluation date is 12/06/2013.

> [Student's] annual IEP date is 12/04/2013. . . . I would
> like to get approval for this testing as soon as possible.
> We could either have an [IEP] meeting to have you sign
> the consent forms or if you prefer I could fill out the re-
> evaluation forms and bring them by for you to sign. If
> we get this done soon we could then have both the
> annual [IEP] meeting and the eligibility meeting at the
> same time on or before December 4th, 2013.

Defs.' Ex. 8 at 000120.

On October 29, 2013, Mother emailed the Home School, indicating

that she "want[s] to follow the rules of the school, so that [Student] will have the

tests she needs." Pls.' Ex. 3 at 074. She requested testing "at an alternative site,"

because "[t]he problem is that [Student] is so deathly afraid to go to [Home

School]." *Id.* (The DOE agreed to "any alternate venue" for testing. July 2014

Decision at 14.) Mother also agreed to meet on November 15, 2013 to discuss an

IEP. Pls.' Ex. 3 at 074.

**D.     The November 15, 2013 IEP Meeting**

An IEP meeting was held with the IEP team on November 15, 2013 --

it was attended by the Home School Principal, a district educational specialist, two

special education teachers, and a general education teacher. July 2014 Decision at

10. The court refers to all these participants (including Student's Mother) as the

"IEP team."[6]  Student's Mother, Plaintiffs' counsel (Mr. Peck), and Defendants' counsel participated by telephone conference.  *Id.*

The meeting began with a draft IEP, *see* Pls.' Ex. 1 at 015-025 -- a teacher emphasized that it was a "working document" and she was seeking the IEP team's input on a final IEP.  July 2014 Decision at 10.  "The draft IEP was based on the Student's last April 26, 2013 IEP due to the lack of current information on the Student."  *Id.*  "Even though the box for denial of ESY services was checked off, [the teacher] explained that she used the last IEP as a starting point, and ESY was still open for discussion."  *Id.*

Student had not been at school since August 23, 2013.  "Student had not taken any tests or assessments that would inform [the Home School] about her current academic levels or how she progressed through the semester."  *Id.*  Rather, "[t]he IEP team used Student's prior test scores and information that was available to them at the time of the meeting."  *Id.*  "The IEP team discussed the Present Levels of Educational Performance ('PLEPS') in detail.  They looked at Student's decoding skills, reading comprehension, writing, math, health concerns, mental and emotional health, social skills, functional living skills, [and] parent concerns."

---

[6]  A DOE psychologist and a DOE psychologist intern also attended a December 12, 2013 IEP meeting.  July 2014 Decision at 14; Defs.' Ex. 3 at 000047.  They are also part of the "IEP team."

*Id*.

"Mr. Peck stated that he wanted to discuss Student's mental and emotional health concerns. Mr. Peck stated that Student is 'devastatingly afraid of coming back to the school -- she won't do it.'" *Id.* at 11. Similarly, "Student's Mother stated that Student is 'deathly afraid of going back' to Home School." *Id.* A teacher "asked Mother if Student was receiving services, or if there were any medical reports or medical records. Mr. Peck stated that he would provide parts of the medical record as soon as they become available." *Id.* (Nothing in the record indicates that any specific medical information was later provided to the IEP team.)

"Mother stated that Student does not have the functional living skills that she had prior to the incident." *Id.* "Student needs help bathing, going to the bathroom, and needs prompting or cueing to complete tasks." *Id.* "Student's motor skills in her right hand were not the same. Student trips, her gait is off, and she has poor balance." *Id.* "She is irritable and has trouble focusing. Student eats with pain, and she has loss or altered hearing in her left ear." *Id.* at 11-12. "The IEP team inquired about what types of help Student required to obtain her functional living skills. Mother simply replied that Student needs help with these skills." *Id*. at 12.

The IEP team discussed the ESY guidelines. "Each ESY eligibility factor from the DOE guidelines was read to the team. Mr. Peck stated that Student should receive ESY services because of her [past] high rate of absenteeism." *Id*. (They were referring to Student's seventh grade year, and absences resulting from her pre-August 2013 medical condition.) A teacher "prefaced the discussion by stating that they were basing their analysis on the current PLEPs that they had just discussed." *Id*. "Mr. Peck stated that Student had been receiving extra services from their parents during the breaks, but he refused to let the IEP team know what these services were and how long they provided them. Based on the information that the DOE had, the Student was denied ESY services. [Plaintiffs] disagreed." *Id*.

"The IEP team tried to determine how many minutes of special education support services Student would receive for her four core classes in the general education setting. . . . They decided on 750 special education minutes on a weekly basis. *Id*. "When the team tried to seek feedback from Mr. Peck, he repeatedly said 'hayberrily' (phonetic) while laughing at the process. The IEP team became upset with his continuous unprofessional behavior and had to take a

break." *Id.* at 12-13.[7]

"After the break, the IEP team continued to talk about the services section. They proposed 750 minutes based on the PLEPs. Mr. Peck objected to the IEP team 'predetermining' Student's 'placement.' [A teacher] clarified that this was only a proposal, based on their limited information. Mr. Peck disputed the process by which the IEP team calculated the 750 minutes of services, and he refused to propose an alternative solution. Instead[,] Mr. Peck told the IEP team, 'you don't know what you're doing' and made derogatory remarks to the team members. [A teacher] stated that the services stated could be provided anywhere, and they were not discussing placement. She asked if the services were acceptable. Mr. Peck responded, 'God all mighty' and didn't answer the question." *Id.* at 13.

"Based on the impasse, the IEP team decided to talk about placement.

---

[7] A DOE attorney asked Mr. Peck what he was referring to by the term "hayberrily," and Mr. Peck replied, "I'm looking it up on Google." Defs.' Ex. 10, Part II, Track 2 at 41:40. Throughout the IEP meeting, Mr. Peck made similarly unprofessional and obtrusive remarks such as mimicking a DOE employee's accent, and belittling the DOE participants. Moreover, at times, he spoke in a demeaning tone to his own client. Needless to say, this sarcastic, bizarre, and unexplained conduct falls well short of the professionalism and civility expected of (and typical of) the Hawaii Bar, especially in a forum among educators developing an IEP that should be based on collaboration, not confrontation. And this is not the first time a Judge of this court has admonished Mr. Peck for unprofessionalism. *See Jill W. v. Hawaii, Dep't of Educ.*, 2012 WL 4472282, at *5 n.2 (D. Haw. Sept. 25, 2012). The court's ruling, of course, is based on the facts presented and is not influenced by Mr. Peck's unprofessional demeanor.

Mr. Peck still refused and said that the services and placement were 'one in the same.' Yet, he wanted to discuss services and [aids.] When the IEP team asked him questions, Mr. Peck changed his mind and wanted to discuss Student's needs, modifications, interventions, and methodology in order to address her goals and objectives in the classroom. The team then [discussed] Mother's requested needs and services from the last IEP, and Mr. Peck said that they were 'off base' because it didn't discuss her current needs and services." *Id.* The November 15, 2013 meeting was continued to a later date.

## E.    The December 12, 2013 IEP Meeting

The DOE attempted by email and in writing to reconvene an IEP meeting with Student's parents. Defs.' Ex. 8 at 000123. Mother requested that the IEP meeting reconvene on December 5, 2013, but Mother did not show up for the meeting or answer her telephone. July 2014 Decision at 13. Mother called the DOE later on December 5, 2013, saying she will attend an IEP meeting on December 6, 2013. *Id.* Mother and a District Educational Specialist discussed the "agenda of the meeting: eligibility, request for evaluations, continuing IEP to finish from previous meeting." Defs.' Ex. 8 at 000128. "Mother said she would like to discuss home-hospital (she would provide a doctor's note), assessments, and BHS counseling at home during the home-hospital term." July 2014 Decision

at 13; Defs.' Ex. 8 at 000128.  Mother, however, did not attend the December 6, 2013 IEP meeting, and it was rescheduled to December 12, 2013.  *Id*. at 14.

The IEP team reconvened on December 12, 2013 (counsel for both sides did not attend).  "The IEP team started the meeting talking about evaluations. Mother stated that she wanted Student to get assessments" regarding her current condition.  *Id.*  "The IEP team suggested academic and cognitive assessments. . . . The IEP team decided that the cognitive, academic, behavior, and adaptive assessments were needed to complete the IEP.  They wanted to review her results from before and after the [August 23, 2013] incident."  *Id.*  "[The] IEP team found, despite the lack of information, Student continued to be eligible for special education services, under 'other health impairments.'  Mother agreed."  *Id.*

A teacher "also suggested Student complete an adaptive assessment to measure her level of daily living, motor functioning, communication, social, and leisure skills from before and after [the August 23, 2013 incident]."  *Id*.  "[A] DOE Psychologist also suggested behavioral testing because Mother stated Student is 'frustrated.'"  *Id.*

"Mother said Student doesn't trust the DOE and would not agree to go to Home School for testing.  The DOE Psychologist said they would not do testing at the Home School and offered home assessment."  *Id.*  A teacher "offered

to come with the DOE Psychologist to make Student more comfortable." *Id.*

"They were open to any alternate venue and suggested the library, a place of business, or the home, stressing flexibility. The DOE Psychologist said that the assessments could take place during the winter break." *Id.*

"The IEP team decided on a comprehensive assessment to include speech and language and fine motor skills." *Id.* A teacher told Mother that she needs to sign consent forms for testing, and said she would mail the consents with a self addressed stamped envelope (Mother was attending via teleconference, and was unable to sign the consent forms at the meeting). *Id.* at 14-15. She told Mother that "[o]nce the DOE receives the consents, they could start the assessments in January, 2014." *Id.* at 15.

"The IEP team also discussed home hospital while Student is unable to attend school. Mother agreed to have Student's doctor complete the form to get her home instruction." *Id.* "The IEP team expressed that they wanted to start services 'right away.' The team also requested Mother sign a consent for information so that the school and Student's doctor could talk directly to each other. Mother did not want to disclose additional information on Student's medical issues, but she agreed [(at least initially)] to cooperate and provide relevant medical reports regarding the incident." *Id.*

"The IEP team then explained that there were two separate processes. The first part was to discuss home hospital to get Student the services Student needed at that time. The second part was to go through the IEP to discuss what services Student would receive when Student came back to school." *Id.*

"Mother repeatedly stated that student needs ESY because Student needs to be with other kids and is always sick. The IEP team explained the ESY factors to Mother. The team suggested that the ESY services be denied based on the previous IEP; however, after assessments they could revisit it. [The IEP team] agreed to come back to ESY once the assessments were completed. The DOE Psychologist said no one is suggesting that Student be denied ESY services at this time; rather, they would be better able to guide the ESY after the testing." *Id.*

"Mother asked to talk about services next. [A teacher] explained that Student would receive the maximum amount of study skills, 750 minutes per quarter. [The District Education Specialist] stated that the team would leave everything else the same until the assessments were completed. The IEP would 'place hold' the existing services. [A teacher] said it was difficult to recommend services at this time because the teachers haven't seen Student and have no information [on] Student's current abilities. Mother disagreed with this approach because 'they needed to help [Student].'" *Id.* at 15-16.

"The IEP team offered Student home counseling to help her right away.  Mother did not respond and instead asked when Student would be receiving special education classes.  The IEP team responded that Student would receive special education services when she returned to school and then described the services."  *Id.* at 16.

"The IEP team discussed home hospital and home bound services. Home bound service is typically for students with behavioral problems.  Home hospital is based on a doctor's determination that a student has a medical issue and cannot leave home.  The IEP team discussed that they could make the determination for home bound services, rather than wait for a doctor's determination.  Student could receive home bound tutoring services immediately until the assessments were completed."  *Id.*  "Mother did not respond to the offer of home bound tutoring services.   Instead she wanted Student to attend ETI."  *Id.*

"Mother stated that Student does not want to have anything to do with DOE or the Home School because she is traumatized."  *Id.* at 17.  The IEP team "told Mother that the tutors are not necessarily Home School teachers, and the tutors could be contracted by the DOE to provide home tutoring."  *Id.*  As for ETI, some IEP team members "explained that it would not be in Student's best interests because she would be unable to earn transferrable credits from schooling

at ETI. The team wanted Student to earn credits through home bound tutoring services so that she could eventually attend high school. Mother disagreed with home bound services." *Id.* A teacher "reminded [Mother] that the IEP was 'not set in stone' and that they would be revising it after they received the assessments." *Id.* A teacher "then asked Mother if she wanted '500 minutes a week.' Mother insisted on ETI five days a week, six hours per day." *Id.*

"The Principal offered placement at Home School with a 1:1 aide to ensure Student's safety, or another DOE middle school, [(Maui Waena Middle School or Lokelani Middle School)]. The Principal stated that she visited Maui Waena Middle School and felt it could be an appropriate placement. The Principal also stated that Lokelani was a smaller setting. Mother again disagreed and told the IEP team that Student would not go to any DOE school because 'her brain was broken.'" *Id.* at 17-18.

The IEP team repeatedly explained that more testing and information was needed. When Mother "wanted to discuss Student's ability in the classroom to understand what Student really needs," a teacher again stated that "they didn't know what [Student's] disabilities were because they hadn't seen or tested Student [since the August 23, 2013 incident]." *Id.* at 18. "[O]nce they had that information, they could make an informed decision. At this point, they were

trying to formulate an IEP with the information they had." *Id.* When Mother

"asked for methodologies and interventions for Student," a DOE Psychologist

"explained that they needed the assessments first so that they could design

instruction to meet Student's needs." *Id.* When Mother went back to saying, "I

want to talk about Student's needs in the classroom, " the DOE Psychologist said,

"[w]e don't have a really good picture of her needs right now." *Id.* at 19.

As for home tutoring, a teacher reiterated that "[w]e don't know her

needs until she gets assessed," and that the DOE "wanted to start tutoring at home

now and then reconvene in January after her assessments to readjust the IEP." *Id.*

"The IEP team again told Mother that Student needed to be assessed to determine

her needs and services in the classroom and that the home instruction tutor they

were offering Student would provide her with immediate curriculum and would

determine the methodology. The tutor would also help Student to transition back

to school. The IEP team restated that the proposed tutoring service be started now,

until assessments are completed. Mother did not accept this proposal and wanted

ETI instead." *Id.*

"The IEP team informed Mother that the LRE [(least restrictive

environment)] would be a combination of special and general education with

supplementary aides and services on a DOE campus. The Student would receive

24

home tutoring until the assessments were completed.  She would transition back to school slowly with the support of counseling services to reduce Student's anxiety, help to process the incident, and help to develop peer relationships and a friendship base.  Student would also have a paraprofessional or 1:1 aide to watch over her.  The [District Educational Specialist] hoped that this offer would alleviate Mother and Student's fears." *Id.*

"Mother finally said that Student would not agree to testing or tutoring.  The IEP team then discussed the services and counseling that the Home School would be providing Student and the disagreements." *Id*. at 20.  An IEP team member "summarized the supplementary aides and services the DOE was offering so that Mother would know what she was giving up if she chose not to take the services.  This included a 1:1 aide for [Student's] safety, tutoring, and counseling." *Id.* at 21.  Mother stated that she wanted to talk to her counsel, and reiterated her desire for the DOE to pay for ETI on a full-time basis.  Defs.' Ex. 10, Part III at 144:17 to 150:00.  The IEP team indicated it would put its offer of FAPE in writing, and mail it, along with the requested consents, to Mother.  *Id.* Mother indicated she was disappointed, and appears to have hung up the phone when a District Education Specialist was summarizing the DOE's position.  *Id*.; July 2014 Decision at 21.

**F.    The DOE's Offer of FAPE with the December 12, 2013 IEP**

After the December 12, 2013 IEP meeting, the Home School issued

two "Prior Written Notices" ("PWN") to Mother.  *See* Defs.' Ex. 3 at 000053-

000056.  The first PWN, dated December 18, 2013, stated that the DOE "proposed

to continue Special Education eligibility for [Student] under the Other Health

Disability category," and provided that "[t]he team requested an evaluation

process with assessments to explore whether another eligibility category would

best describe [Student's] current needs."  *Id.* at 000053.  The second PWN, dated

December 20, 2013, outlined proposed special education services, with

"modifications" including "[o]ne to one tutoring," and services that "will take

place in the Homebound setting."  *Id.* at 000055.  It stated, in pertinent part, that:

1.    Special Education services are needed for student to benefit
       from the education services in the areas of reading, math and
       writing.

2.    SBBH Counseling services will address student needs in area
       of socialization, anger management and self-directed problem
       solving.  Counseling will also help [Student] process the
       incident that occurred in August.

3.    Parent reported that [Student] is afraid to come to school and
       parent wants to ensure that [Student] is safe.  Special Education
       services at home are needed to address student's below grade
       level skills in the areas of math, reading and writing, until
       further placement is decided on after further testing is
       completed.

4.      Modifications will allow student to access grade level content/curriculum successfully in the Homebound setting.

5.      Observation and assessment data indicates student does not qualify for Extended School Year services.

6.      Student has demonstrated she does need to have modifications for state assessments.

7.      Student's needs are best met in the Homebound setting.

*Id*.  It also stated that "[o]ptions were offered for [Student] to go to [Home School], Maui Waena or Lokelani campus."  *Id.*

The PWN also described reasons that special education at Home School was rejected:  "Parent strongly feels that [Student] is not ready to be on a public school campus."  *Id.*  "Parent expressed that [Student] is frightened of coming to a DOE school.  Team rejected the idea of having [Student] back on a school setting at this time because they want a DOE teacher and counselor to work with her in her home to gather further educational data, assess her ability to access instruction and establish rapport and address her emotional needs."  *Id.*

The December 12, 2013 IEP described, as background, the reason Student had not been in school since August 23, 2013, and the Home School's offers of home hospital instruction.  Defs.' Ex. 3, at 000037.  It stated that Home School staff members "have made multiple attempts to gain a consent for

exchange of information with [Student's] doctors, but parent has declined to provide consent. Information from the doctor is needed to enable the DOE to provide home/hospital instruction." *Id.*

The "Parent Concern" section of the December 12, 2013 IEP provided (based on reports from Mother):

1. [Student] needs to be cued to get up and move, to [bathe] and eat, some days more than other days;
2. Motor skills in her right hand are not the same as before the accident;
3. Balance and gait is off, especially if she is tired;
4. She is more irritable;
5. She has problems focusing;
6. [Student] deals with pain daily;
7. It is painful for her to chew;
8. Loss of hearing in left ear;
9. She misses school; and
10. [Mother] reports that since the August 23rd incident, [Student] is deathly afraid to come back [to] school and [Student] refuses to do so.

*Id.* at 000038.

The December 12, 2013 IEP offered 240 minutes per week of Special Education, and 290 minutes per quarter of counseling. *Id.* at 000044. It offered a host of supplementary aids and services on a daily basis. It reiterated that "[Mother] and the team also agreed that extensive testing needs to happen so we can better understand [Student's] current levels of functioning and needs.

[Mother] and the team are requesting testing in the following areas[:] academic, cognitive, speech/language, [behavioral] and adaptive -- fine and gross motor skills." *Id*. It also recognized that testing could not be done without parent consent: "[s]ince [Mother] attended the meeting via telephone the 'Consent for Assessment as Part of a Reevaluation' form along with a [PWN] is being mailed to [Mother]. . . . Once the school receives the consent form back, testing will begin in [January]." *Id.*

Regarding ESY, the IEP acknowledged that "[Mother] insisted that her daughter needs ESY services saying her daughter's skill set has dramatically declined since the alleged physical injuries on 8/23/13." *Id*. "The team said that once all of the [official] testing is done that we would reconvene to see if [Student] would then qualify under the ESY guidelines." *Id.*

It explained that "[Student] will be receiving homebound tutoring minutes of 240 minutes per week as a transition service so she can work on her core subject areas while we wait for her to [complete] the testing. The tutoring will take place at home, at the public library or [wherever] the tutor and [Mother] decide upon." *Id*. at 000045. Regarding supplementary services, "[t]he team suggested a 1:1 [aide] for [Student] if she feels she needs one to return back to school and feel safe. The team decided we will discuss this more in-depth once

the testing is done and once [Mother] decides which school she would like [Student] to attend." *Id.* The Home School Principal offered three options for Student to attend school, indicating "[Mother] will need to decide which school she wants [Student] to attend once all of the testing is completed." *Id.* "In the meantime, [Student] will be receiving homebound tutoring services." *Id.* And it further explained why Student was not being integrated into general education:

> Currently [Student] is going to [ETI] to receive tutoring services so she keeps up on some of her academics. Based on this information the team realized that since [Student] is not homebound . . . the homebound option does not apply. However, since extensive testing is going to take place in order for the team to better understand [Student's] current needs, [Mother] and the team agreed that homebound tutoring services will be put into place starting January 2014. The tutoring services will continue until testing is complete, then at that time the team will meet again and further develop the IEP in order to design the services [Student] needs.

Defs.' Ex. 3 at 000046.

## G.     Events After the IEP Meeting

After the December 12, 2013 IEP meeting, the DOE continued to offer tutoring services to Student. A Student Services Coordinator ("SSC") "left a message with Mother on December 19, 2013, January 7, 2014, and January 23, 2014 about tutoring services for Student [but] Mother did not return her calls."

July 2014 Decision at 22. "On January 8, 2014, the SSC emailed Mother about tutoring services for Student and did not receive a reply." *Id.* Similar calls were made on February 7, 2014 and February 11, 2014. *Id.* Likewise, on February 7, 2014, "Principal sent Mother a letter stating that she needed the 'Consent for Assessment' that was mailed on December 12, 2013. The Principal further stated that [the school was] waiting to start homebound tutoring services for Student." *Id.*; Defs.' Ex. 8 at 000125.

At the administrative hearing, Mother testified that Student now attends ETI from 9:00 a.m. to 2 p.m. on Monday, Wednesday, and Friday. July 2014 Decision at 22; Tr. (April 29, 2014) at 48. She testified that Student is working at "probably first to second grade level." Tr. (April 29, 2014) at 49. "Mother testified [at the administrative hearing] that Student has not taken any formalized testing at ETI because 'she was not ready yet.'" *Id.* at 50.

## H. Further Proceedings

On December 20, 2013, Plaintiffs filed a First Amended Complaint (Request for Due Process Hearing) at the administrative level, adding challenges to the December 12, 2013 IEP. AR at 2-7. The administrative hearing was held on April 29 and 30, 2014. In relevant part, Plaintiffs argued:

The December 12, 2013 IEP denied Student a FAPE because:

1. The DOE did not hold an appropriate placement discussion;
2. The placement was not in the LRE;
3. The DOE did not discuss parent's concerns regarding Student's needs; and
4. The DOE did not discuss parent's concerns regarding ESY.

July 2014 Decision at 40. The Hearings Officer concluded that "[Plaintiffs] have not shown that, procedurally and substantively, the . . . December 12, IEP[] denied Student a FAPE." *Id*. at 40.

On August 11, 2014, Plaintiffs filed this action, challenging the July 2014 Decision. Doc. No. 1. The Administrative Record on Appeal was transmitted on February 2, 2015. Doc. No. 14. Plaintiffs filed an Opening Brief on April 27, 2015, Doc. No. 18, and Defendants filed an Answering Brief on May 29, 2015. Doc. No. 19. Plaintiffs did not file a Reply. The court heard oral argument on July 8, 2015. Doc. No. 22.

## III. <u>STANDARD OF REVIEW</u>

Under the IDEA, "[a]ny party aggrieved by the findings and decision" of the hearings officer "shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). The IDEA provides that the court:

> (i) shall receive the records of the administrative
> proceedings;
>
> (ii) shall hear additional evidence at the request of a
> party; and
>
> (iii) basing its decision on the preponderance of the
> evidence, shall grant such relief as the court determines
> is appropriate.

20 U.S.C. § 1415(i)(2)(C).  *Board of Education of Hendrick Hudson Central*

*School District v. Rowley*, 458 U.S. 176, 206-07 (1982), explains the court's role

in reviewing an administrative decision in an IDEA case:

> [T]he provision that a reviewing court base its decision
> on the "preponderance of the evidence" is by no means
> an invitation to the courts to substitute their own notions
> of sound educational policy for those of the school
> authorities which they review. . . .  The fact that
> § [1415(i)] requires that the reviewing court "receive the
> records of the [state] administrative proceedings" carries
> with it the implied requirement that due weight shall be
> given to these proceedings.  And we find nothing in the
> Act to suggest that merely because Congress was rather
> sketchy in establishing substantive requirements, as
> opposed to procedural requirements for the preparation
> of an IEP, it intended that reviewing courts should have a
> free hand to impose substantive standards of review
> which cannot be derived from the Act itself.  In short, the
> statutory authorization to grant "such relief as the court
> determines is appropriate" cannot be read without
> reference to the obligations, largely procedural in nature,
> which are imposed upon recipient States by Congress.

*See also City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 171 (1997)

(citing *Rowley* for the proposition that the IDEA "contemplates deferential review

of state administrative action"). The "fact-intensive nature" of IDEA proceedings

"coupled with considerations of judicial economy render a more deferential

approach appropriate." *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104

n.4 (9th Cir. 2007).

       Despite this deferential approach, the court has discretion in

reviewing the hearings officer's decision:

> The proposition that the courts must give "due weight"
> raises the question of how much weight is "due." We
> held in *Gregory K. v. Longview Sch. Dist.*, 811 F.2d
> 1307, 1311 (9th Cir. 1987), that "[h]ow *much* deference
> to give state educational agencies . . . is a matter for the
> discretion of the courts." . . . [W]e held in *Gregory K.*
> that the courts are to consider the findings "carefully and
> endeavor to respond to the hearing officer's resolution of
> each material issue," but the court "is free to accept or
> reject the findings in part or in whole." *Id.*
>> When exercising its discretion to determine what
> weight to give the hearing officer's findings, one
> criterion we have found useful is to examine the
> thoroughness of those findings. The amount of
> deference accorded the hearing officer's findings
> increases where they are "thorough and careful."

*Wartenberg*, 59 F.3d at 891 (citations omitted; alterations in original); *see also,*

*e.g., J.W. ex rel. J.E.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir.

2010) ("This Court gives deference to [a Hearings Officer's] decision 'when it

evinces his or her careful, impartial consideration of all the evidence and demonstrates his or her sensitivity to the complexity of the issues presented.'") (quoting *Cnty. of San Diego v. Cal. Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996) (internal editorial marks omitted)).

Where a hearings officer's decision contains some findings that are "thorough and careful," and others that are not, the court can give deference to the thorough and careful findings and yet review other findings independently. *See R.B., ex rel. F.B.v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 943 (9th Cir. 2007) ("[W]e accord particular deference to the [hearings officer's] 'thorough and careful' findings . . . although we independently review the testimony in the record that [she] failed to consider.").

The burden of proof in this IDEA proceeding is on Plaintiffs -- the party challenging the administrative ruling. *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *see also J.W.*, 626 F.3d at 438.

## IV. <u>DISCUSSION</u>

The court first sets forth the applicable legal framework, and then addresses whether the Hearings Officer erred in determining that the DOE did not deny Student a FAPE.

## A.    Legal Framework

A basic three-step analysis applies in determining whether a violation of the IDEA denies a qualified disabled student a FAPE.

First, the court asks whether the school district violated the IDEA, either "procedurally" or "substantively." *Rowley*, 458 U.S. at 206-07. A school district may violate the IDEA's statutory or regulatory procedures in creating or implementing (or failing to create or implement) an IEP. *Id.* Or a school district may violate the IDEA substantively by offering an IEP that is not reasonably calculated to enable the child to receive educational benefit. *Id.* The school district must provide the student with a FAPE that is "appropriately designed and implemented so as to convey" to the student a "meaningful" benefit. *J.W.*, 626 F.3d at 433 (quoting *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)).

Second, if the court finds a violation of the IDEA's procedures, the court addresses whether that violation denied that student a FAPE -- for not all procedural violations are actionable. *See, e.g.*, *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 909 (9th Cir. 2008); 20 U.S.C. § 1415(f)(3)(E)(ii).[8] The

_____

[8] Section 1415(f)(3)(E)(ii) provides:

> In matters alleging a procedural violation, a hearing officer may
> find that a child did not receive a free appropriate public education
> only if the procedural inadequacies--

(continued...)

procedural violation must result in the "loss of [an] educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process." *Capistrano Unified Sch. Dist.*, 556 F.3d at 909 (citation and quotation marks omitted). That is, "where a procedural violation does not result in a lost educational opportunity for the student, the violation is 'harmless error' because it does not deny the student a FAPE." *R.B.*, 496 F.3d at 938 n.4 (citation omitted).

The third stage is the remedy -- and this stage itself includes several steps. If an IDEA violation results in denial of a FAPE, a district court has discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). Such relief could include reimbursement for a private placement. *See* 20 U.S.C. § 1412(a)(10)(C)(ii); *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985). The parent or guardian, however, must also establish that the particular private placement is itself "appropriate." *See, e.g.*, *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1183 (9th Cir. 2009).

---

[8](...continued)
> (I) impeded the child's right to a free appropriate public education;
> (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or
> (III) caused a deprivation of educational benefits.

"The standard for evaluating IEPs, commonly called the 'snapshot rule,' is not retrospective." *J.W.*, 626 F.3d at 439 (citing *Adams*, 195 F.3d at 1149).

> We do not judge an [IEP] in hindsight; rather, we look to the [IEP's] goals and goal achieving methods at the time the plan was implemented and ask whether these methods were reasonably calculated to confer [Student] with a meaningful benefit . . . .  In striving for "appropriateness," an IEP must take into account what was, and what was not, objectively reasonable when the snapshot was taken, that is at the time the IEP was drafted.

*Id.* (quoting *Adams*, 195 F.3d at 1149).

## B.     Application of Principles

### 1.     *There Was No Improper Predetermination of "Placement"*

Plaintiffs argue that the DOE violated the IDEA's procedures by predetermining her placement before discussing all aspects of the IEP at the November 15, 2013 and December 12, 2013 IEP meetings.  They argue that the placement discussions were improper because the DOE "determined Student's placement before addressing and/or completing the development of the elements of the IEP needed to determine placement," and "conflated the discussion of services with a determination of Student's placement."  Doc. No. 18, Pls.' Mem. at 3, 4.  This argument has no merit.

"A school district violates the IDEA if it predetermines placement for a student before the IEP is developed or steers the IEP to the predetermined placement." *K.D. v. Dep't of Educ.*, 665 F.3d 1110, 1123 (9th Cir. 2011) (citations omitted).[9] "Predetermination violates the IDEA because the Act requires that the placement be based on the IEP, and not vice versa." *Id.* "Predetermination occurs when an educational agency determines a student's placement prior to an IEP and is unwilling to consider any other placement." *Lofisa S. v. Dep't of Educ.*, 2014 WL 6432899, at *5 (D. Haw. Nov. 14, 2014) (citing *K.D.*, 665 F.3d at 1123). "Predetermination is problematic under the IDEA because it deprives parents of the opportunity to participate in the IEP process." *Id.* at *7 (citations omitted).

"In cases in which the Ninth Circuit has found predetermination or

---

[9] "'[E]ducational placement' within the meaning of the IDEA does not refer to a specific location or program." *Carrie I. v. Dep't of Educ.*, 869 F. Supp. 2d 1225, 1239 (D. Haw. 2012) (citing *K.L.A. v. Windham Se. Supervisory Union*, 371 F. App'x 151, 153-54 (2d Cir. 2010)). "The [United States Department of Education's] longstanding position is that placement refers to the provision of special education and related services rather than a specific place, such as a specific classroom or specific school." *Id.* (citing 71 Fed. Reg. 46540, 46687 (Aug. 14, 2006)). "Likewise, [HAR] § 8-60-2 (effective Nov. 23, 2009), defines 'placement' as 'an educational setting' and 'does not mean the specific location or school but the type of placement on the continuum of placement options.'" *Id.* In this context,

> "[E]ducational placement" means the general educational program of the student. More specifically . . . under the IDEA a change in educational placement relates to whether the student is moved from one type of program -- *i.e.*, regular class -- to another type -- *i.e.*, home instruction. A change in the educational placement can also result when there is a significant change in the student's program even if the student remains in the same setting.

*N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1116 (9th Cir. 2010).

serious infringement on parental participation, the school district generally

developed the entire IEP without any parental input, refused to accommodate the

parents' requests to reschedule, or committed other serious errors in conjunction

with the failure to secure parental participation." *Cupertino Union Sch. Dist. v.*

*K.A.*, --- F. Supp. 3d ----, 2014 WL 6790182, at * 9 (N.D. Cal. Dec. 2, 2014). For

example,

> [i]n *Anchorage School District v. M.P.*, 689 F.3d 1047
> (9th Cir. 2012), . . . the parents refused to attend an
> annual IEP meeting and instead provided extensive
> written commentary on the school's IEP draft. The
> school district then chose to *revert* to a two year-old IEP,
> rather than continue the IEP process to consider the
> parents' input. The Ninth Circuit found this to be a
> substantive violation of the school district's obligation to
> have a revised IEP in place every year. *Id.* at 1056.

*K.A.*, 2014 WL 6790182, at *9. As another example, *Sam K. v. Department of*

*Education*, 2013 WL 638603 (D. Haw. Feb. 13, 2013), *aff'd*, 788 F.3d 1033 (9th

Cir. 2015), concluded that an educational placement was improperly

predetermined where "the program director at the proposed public placement was

the only program director . . . to attend IEP meetings [and] no other potential

placements [were] mentioned," and where "a handwritten note [indicated that]

months before the final IEP, Defendant had already chosen the Public Placement

without Plaintiffs' input." *Id.* at *12.

None of those concerns is implicated here -- Mother had every opportunity to participate in the process, and the IEP team considered all available information. Although Defendants started the IEP process with a draft, the IEP team members constantly informed Mother and her counsel that the draft was only "a starting point" and that the IEP team needed input (both from Mother, and in the form of updated assessments and medical information) to fully consider Student's placement -- that is, the full range of special education and related services, as well as the potential locations for those services. Indeed, at the December 12, 2013 IEP meeting, the draft IEP was changed substantially (based specifically on input from Mother) in offering an educational placement providing for home tutoring and instruction, pending additional testing. The December 12, 2013 IEP specifically called for further placement discussions, *after* receipt of needed information. A range of options was also considered and discussed, offering Student three potential public school locations, again pending the receipt of new information.

This approach -- beginning the IEP process with a draft, and modifying it based on input at an IEP meeting -- is completely consistent with caselaw examining similar facts. *K.D.*, for example, determined that placement was not predetermined where school officials came to an IEP meeting with "an

open mind," and considered a range of options, including "placement at Loveland, at another private school setting . . . , and in a full inclusion class setting with same age peers without resource special education services," but "reasonably rejected them, and therefore did not predetermine K.D.'s placement." 665 F.3d at 1123. *See also, e.g.*, *A.G. v. Hawaii*, 2015 WL 3822309, at *5 (D. Haw. June 19, 2015) (upholding finding of no predetermination of placement where "Plaintiffs acknowledge that they were heard on this subject at the October 29, 2013 IEP meeting, that they had the opportunity to ask questions, and that they provided their feedback about placement in the program at that time").

### 2. *There Was No Mainstreaming Violation*

Plaintiffs next argue that the December 12, 2013 IEP violated the IDEA's requirement to educate students, to the "maximum extent appropriate," with nondisabled students. *See* 20 U.S.C. § 1412(a)(5)(A). They argue that the IEP team failed to comply with *Sacramento City Unified School District v. Rachel H.*, 14 F.3d 1398, 1404 (9th Cir. 1994) (identifying factors to consider when addressing the IDEA's "mainstreaming" requirement to place a child in the LRE), and that this failure denied Student a FAPE. The court disagrees.

"While every effort is to be made to place a student in the [LRE], it must be the [LRE] which also meets the child's IEP goals." *Cnty. of San Diego*,

93 F.3d at 1468.  And in determining the LRE, courts consider the "*Rachel H.*" factors: "(1) the educational benefits of placement full-time in a regular class; (2) the non-academic benefits of such placement; (3) the effect [Student] had on the teacher and children in the regular class; and (4) the costs of mainstreaming [Student]." *Rachel H.*, 14 F.3d at 1404.  But even if these factors are not specifically discussed, Plaintiffs must still show prejudice from such a failure. Plaintiffs must demonstrate how any procedural inadequacies have resulted in the loss of educational opportunity or infringement on their ability to participate in the formulation of the IEP.  *See L.M.*, 556 F.3d at 909.

The December 12, 2013 IEP offered an initial placement in a home setting, including a tutor and counseling (at a location of Mother's choice -- the home, a library, "or [wherever] the tutor and [Mother] decide upon."  Defs.' Ex. 3 at 000045).  This setting was specifically to accommodate the Student's fear of the Home School or of a DOE school.  It addressed Student's safety needs, and Mother's concerns.  As detailed above, a significant component of this IEP also concerned the need for additional testing and evaluations -- the need for updated information regarding Student was obvious given Mother's descriptions of Student's condition after the August 23, 2013 incident.  The DOE repeatedly notified Mother of the requirement for parental consent before such assessments

could take place.  In this regard, the DOE was constrained by the IDEA's mandates for such consent.  *See, e.g.*, 20 U.S.C. § 1414(c)(3) ("Each local educational agency shall obtain informed parental consent . . . prior to conducting any reevaluation of a child with a disability[.]"); 34 C.F.R. § 300.300(c)(1)(i) ("[E]ach public agency . . . [m]ust obtain informed parental consent . . . prior to conducting any reevaluation of a child with a disability[.]"); *cf.* 20 U.S.C. § 1414(a)(1)(D)(i)(I) (requiring informed consent from the parent before conducting an initial evaluation); *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1315 (9th Cir. 1987) ("If the parents want [student] to receive special education under the [IDEA], they are obliged to permit such testing."); *Andress v. Cleveland Indep. Sch. Dist.*, 64 F.3d 176, 178 (5th Cir. 1995) ("If a student's parents want him to receive special education under the IDEA, they must allow the school itself to reevaluate the student.").

Viewed in this context, the December 12, 2013 IEP was eminently reasonable -- it offered a plan that was "appropriately designed and implemented so as to convey" to Student a "meaningful" benefit.  *J.W.*, 626 F.3d at 433.  It is difficult to envision anything else the DOE could have done.  The DOE -- faced with (1) the obvious need for more specific information (and the requirement to obtain consent before conducting formal evaluations), and (2) the requirement to

develop an IEP that considered all available information, including input from

Mother -- offered a FAPE that took into account all of Student's known needs,

especially at that "snapshot" in time. *See Adams*, 195 F.3d at 1149 ("We do not

judge an [IEP] in hindsight; rather, we look to the [IEP's] goals and goal achieving

methods at the time the plan was implemented . . . . [A]n IEP must take into

account what was, and what was not, objectively reasonable when the snapshot

was taken, that is, at the time the IEP was drafted.").  And it was logical and

proper to base that IEP on available information from the prior IEP, with the

recommendation or requirement for additional testing. *See, e.g.*, *Suffield Bd. of

Educ. v. L.Y.*, 2014 WL 104967, at *8 (D. Conn. Jan. 7, 2014) ("Absent conflicting

post-2009 data, it was reasonable for the [team] to rely on the data from 2009

indicating [student's] need to receive these services and, in reliance on this (the

most recent available) data, to recommend such services, along with reevaluations

to enable appropriate modifications.").[10]

      The DOE's offer of FAPE was made in the face of documented

---

[10]  Plaintiffs also argue that the December 12, 2013 IEP failed to consider the Student's unique needs (the August 23, 2013 incident) because the DOE did not consider specific supplementary aids and services, and did not discuss her physical and emotional safety needs. Doc. No. 18, Pls.' Mem. at 13.  But the DOE did just that -- it considered her needs, and accommodated Mother's concerns about Student's fear of a DOE school.  It offered home tutoring to meet those needs, offered counseling and transition services, three different locations for an eventual DOE school, and a one-to-one aide at Home School if chosen.

frustration.  It repeatedly asked for consent to obtain evaluations and assessments

(but such consent was not given).  Mother, understandably troubled by the August

23, 2013 incident, failed to provide specific medical information about Student's

condition.  Even if a full release of medical information was not necessary, the

record only reflects general descriptions (*e.g.*, "broken" brain), which were

insufficient to plan for specific and precise educational needs.  Nevertheless, the

DOE appears to have recognized that "an [educational] agency cannot eschew its

affirmative duties under the IDEA by blaming the parents."  *Doug C.*, 720 F.3d at

1045 (citation omitted).  "An agency cannot blame a parent for its failure to ensure

meaningful procedural compliance with the IDEA because the IDEA's protections

are designed to benefit the student, not the parent."  *Id.*  The DOE thus acted

appropriately when it "move[d] forward with the IEP process," *id.* at 1045 n.6, and

made its offer of FAPE after Plaintiffs' refusal to accept services.

 Although the *Rachel H.* factors were not specifically mentioned at the

December 12, 2013 IEP meeting, at least the first two -- "the educational benefits

of placement full-time in a regular class" and "the non-academic benefits of such

placement," 14 F.3d at 1404, were considered when the IEP team weighed

whether a home setting for individual tutoring would best accommodate her fears

of the Home School.  The IEP team's offer of FAPE also contemplated a return to

a DOE school (of Mother's choice), with transition services after receiving additional evaluations. The DOE made extensive efforts to educate Student "to the maximum extent appropriate" with nondisabled students in a regular education setting.[11]

And even if the IEP team did not consider the other two *Rachel H.* factors (the effect Student would have on "the teacher and children in the regular class," and "the costs of mainstreaming" the Student), Plaintiffs have failed to demonstrate how this failure resulted in a loss of an educational opportunity, or seriously infringed on Mother's opportunity to participate in the IEP process. *See, e.g.*, *L.M.*, 556 F.3d at 909.

### 3. The IEP Team Adequately Addressed Mother's Request for ESY

Plaintiffs next assert that Student was denied FAPE because the DOE failed to adequately discuss her needs for ESY. But the record establishes that the IEP team "discussed the ESY guidelines for thirty minutes" at the November 15,

---

[11] Some caselaw suggests that the first *Rachel H.* factor "can be dispositive of the entire LRE analysis." *Katherine G. v. Kentfield Sch. Dist.*, 261 F. Supp. 2d 1159, 1173 (N.D. Cal. 2003) ("[T]he District is correct that [*Poolaw v. Bishop*, 67 F.3d 830, 836-37 (9th Cir. 1995)] strongly suggests that where a court finds that mainstreaming will provide no educational benefit -- that is, that the first factor weighs entirely against a finding that the school district has failed to provide the student with instruction and services in the least restrictive environment -- that finding can be dispositive of the entire LRE analysis, even if the other three factors weigh in favor of mainstreaming."), *aff'd*, 112 F. App'x 586 (9th Cir. 2004) (mem.). Because the court is convinced that no harm occurred here, the court need not analyze whether all four factors *must* be considered by an IEP team or a Hearings Officer to fulfill the IDEA's LRE requirement.

2013 IEP meeting. July 2014 Decision at 38. "Each ESY eligibility factor from the DOE guidelines was read to the team," and Mother and her counsel requested ESY services "because of [Student's] high rate of absenteeism." *Id.* A teacher "explained that Student was specifically placed in the Study Skills class" to address her needs. *Id.* Later, at the December 12, 2013 IEP meeting, "[t]he IEP team explained the ESY factors to Mother" for another seven minutes. *Id.* "The team suggested that the ESY services be denied based on the previous [April 2013] IEP; however, after assessments they could revisit it." *Id.* The record establishes that "Mother's concerns about the denial of ESY services were discussed at both meetings for a total of approximately 37 minutes." *Id.* at 39. "Even though the IEP team preliminarily denied ESY services based on the [April 2013 IEP], the IEP team specifically said that they would address whether Student could be eligible for ESY services after the assessments were completed." *Id.*

      Moreover, Plaintiffs have failed to demonstrate substantively that ESY services were necessary in order to provide Student a FAPE. *See N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1211 (9th Cir. 2008) ("A school must provide [ESY] services . . . only if the child's IEP team determines that such services are necessary for the provision of FAPE to the child.") (internal quotation marks and citation omitted). "[A] claimant seeking an ESY must satisfy an even

stricter test, because 'providing an ESY is the exception and not the rule under the regulatory scheme.'" *Id.* (quoting *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 315 (6th Cir. 1990)). "ESY Services are only necessary to a FAPE when the benefits a disabled child gains during a regular school year will be significantly jeopardized if he is not provided with an educational program during the summer months." *Id.* (quoting *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 537-38 (4th Cir. 2002)). "If the child benefits meaningfully within his potential from instruction under a proper IEP over a regular school year, then ESY service may not be required under the Act unless the benefits accrued to the child during the regular school year will be significantly jeopardized if he is not provided an [ESY]." *Id.* at 1212 (quoting *Cordrey v. Euckert*, 917 F.2d 1460, 1473 (6th Cir. 1990)).[12]

### 4. *Plaintiffs Are Not Entitled to Reimbursement for a Unilateral Private Placement*

Finally, because Plaintiffs have sought "reimbursement for Student's private educational placement, including transportation to and from the private school," Doc. No. 1, Compl. at 6, the court briefly addresses the remedial prong of

---

[12] Because Plaintiffs were rejecting any DOE services, it is unclear what they would be seeking for ESY services from the DOE. In any event, Plaintiffs have not demonstrated that benefits gained during a regular school year would be significantly jeopardized if not provided with ESY. *N.D.*, 541 F.3d at 1211. And, again, the December 12, 2013 IEP called for revising the ESY question after additional testing was received.

the IDEA analysis. That is, even assuming Plaintiffs can prove a denial of FAPE, the court could only award reimbursement for a unilateral private placement if that placement is itself appropriate. *See, e.g.*, *Ashland Sch. Dist.*, 587 F.3d at 1183 ("[W]here Parents seek reimbursement for private school expenses, they 'are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act.'" (quoting *Florence Cnty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993)).

In this regard, Plaintiffs have offered no evidence that ETI is an appropriate placement for Student. They offered nothing describing its curriculum, programs, or services. Indeed, they offered no evidence at all of its costs or the amount of reimbursement that they seek. And, although it remains Plaintiffs' burden to prove ETI is appropriate, the only evidence in the record is that ETI is *inappropriate* -- a DOE teacher testified that it is a tutoring service and (at least as of 2006) is not an accredited school, and not a primary educational facility. Whether or not the nature of ETI's services has changed since 2006, the IEP team discussed that Student would not earn transferable credits at ETI so that she could eventually transfer to high school. Accordingly, the court concludes that, even if Plaintiffs could establish a denial of FAPE (which they have not

done), Plaintiffs have not established entitlement to reimbursement for a private placement.

## V. <u>CONCLUSION</u>

For the foregoing reasons, the Hearings Officer's July 2014 Decision is AFFIRMED. Student's December 12, 2013 Individualized Education Plan was an appropriate offer of a Free Appropriate Public Education reasonably calculated to offer meaningful educational benefit. Judgment shall issue in favor of Defendants.

IT IS SO ORDERED.

DATED, Honolulu, Hawaii: July 30, 2015.



/s/ J. Michael Seabright
J. Michael Seabright
United States District Judge

*K.K. v. Dep't of Educ., State of Hawaii*, Civ. No. 14-00358 JMS-RLP, Order Affirming July 2014 Decision of Administrative Hearings Officer